IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WALTER LEE BELL, AP-7365,                    )
                                             )
              Petitioner,                    )        No. C 15-4970 CRB (PR)
                                             )
       vs.                                   )        ORDER DENYING PETITION
                                             )        FOR A WRIT OF HABEAS
MARTIN D. BITER, Warden,                     )        CORPUS
                                             )
              Respondent.                    )
                                             )

       Petitioner Walter Lee Bell, a state prisoner at Kern Valley State Prison in

Delano, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254

invalidating a special circumstance murder conviction from Contra Costa County

Superior Court.  Per order filed on December 8, 2015, the court found that the

petition appears to state cognizable claims for relief under § 2254, when liberally

construed, and ordered respondent to show cause why a writ of habeas corpus

should not be granted.  Respondent has filed an answer to the order to show cause

and petitioner has filed a traverse.

## BACKGROUND

**A.     Statement of the Case**

       The Contra Costa County District Attorney filed an information charging

petitioner with the January 20, 2009 murder of Rylan Fuchs.  Cal. Penal Code §

187.  The information further alleged that petitioner committed the murder while

engaged in, and an accomplice to, the commission and attempted commission of

a robbery, id. § 190.2(a)(17), and personally and intentionally discharged a

firearm causing great bodily injury and death, id. § 12022.53(b), (c), (d).

On May 13, 2013, a jury found petitioner guilty as charged.  On June 21, 2013, the Contra Costa County Superior Court sentenced him to a prison term of 25 years to life consecutive to life without possibility of parole.

On December 31, 2014, the California Court of Appeal affirmed the judgment of conviction and, on March 11, 2015, the Supreme Court of California denied review.

On October 29, 2015, petitioner filed the instant federal habeas action.

**B.    Statement of the Facts**

The California Court of Appeal summarized the facts of the case as follows:

### I. The Prosecution Case

On January 20, 2009 shortly after 9:00 p.m., 17–year–old Rylan Fuchs was shot once in the neck while standing in front of his home on El Capitan Drive in Danville. He was shot from a distance of more than two or three feet. Fuchs's parents heard a bang and went out the front door to investigate. Fuchs's mother called 911. Fuchs was taken to the hospital where he died the next morning.

There was no exit wound. The bullet recovered at the autopsy was a hollow-point .38–caliber bullet that had been chambered in a .38–special or .357–magnum, and was almost certainly fired from a revolver. A hollow-point bullet is designed to kill a human target. It lodged in the left side of the neck after transecting the left carotid artery and jugular vein. Based on the bullet's trajectory and other factors, Fuchs may have been on his knees or bending to the right when shot. The gun was never found.

Contra Costa County Sheriff's deputies and fire department personnel responded to the report of a gunshot injury and set up a crime scene. No drugs or shell casings were found. A cell phone was found sitting on a truck parked in the driveway of Fuchs's home. No weapons or marijuana were found in Fuchs's clothing, which was collected at the hospital.

### A. Events Leading Up to the Shooting

Two days before Fuchs was shot, Gene Souza, an acquaintance of Fuchs's, received a call from Aaron Marks, who was looking for marijuana. Souza gave Marks Fuchs's name and telephone number. Marks used a cell phone with a telephone number ending in 1818 to call Souza.

2

On the afternoon of January 20, 2009, Fuchs and two high school friends, Mitchell Aasen and Tony Mills, were driving around the Danville area. Fuchs was supposed to meet Marks to sell him one-quarter pound of marijuana. Fuchs used his phone to text Marks about arranging a meeting. Fuchs usually only sold marijuana to people he knew. Aasen had safety concerns about Fuchs selling marijuana to Marks by himself, because Marks kept putting off the meeting and changing times. At 8:00 p.m., Aasen took Fuchs home. FN2. Both Aasen and Mills urged him not to go through with the marijuana sale alone.

> FN2. Fuchs had an 8:00 p.m. curfew.  Fuchs's mother knew her son used marijuana but not that he sold it. After Fuchs arrived home, the front door was locked. Fuchs's mother surmised her son had left the house through his bedroom window because the screen had been removed.

Shortly before 9:00 p.m. on January 20, Jeffrey Koepp, a classmate and neighbor of Fuchs, left his house to pick up his younger sister at a dance academy in nearby San Ramon. As he turned left onto Greenbrook Drive, he saw a group of eight African–American youths standing around a white Acura parked near a greenbelt, a walking path for local residents. When he returned on the same street about 10 minutes later after picking up his sister, the youths and the car were gone. However, a black Infiniti in front of him was driving substantially slower than the speed limit. He flashed his bright lights at the car, which eventually pulled over to let him pass. The driver appeared to be an Asian male wearing a khaki cap pulled low over his face.

As Koepp turned onto El Capitan toward home, he saw several African–American youths wearing hoods and gloves hiding themselves. One was crouched behind a car; another was behind a lamppost. Both were looking towards Fuchs's home. He thought the person behind the lamppost was wearing the same jacket as one of the people he had seen earlier on the greenbelt. As Koepp continued toward home, he saw three or four people crouching behind bushes, facing Fuchs's house.

Koepp passed Fuchs's house just before arriving home at 9:12 p.m. He saw Fuchs in his driveway talking with an African–American male who could have been Marks, whom he knew by sight because they both attended San Ramon High School. Koepp drove home and went to his room. He did not hear any gunshots but, about a minute later, he heard sirens and saw lights when he looked outside his bedroom window. He also saw several African–American males scatter in different directions. FN3.

> FN3. Knowing that Fuchs sold marijuana, when he saw the African-American youths hiding near Fuchs's house, it occurred to Koepp that Fuchs might "get jumped or something," but he "wasn't going to get involved." He also

did not call the police because he thought the youths were just playing around.

### B. Events After the Shooting

In late January 2009, Emily Amkhamavong was living in Richmond, California with her parents, her brother Tony, and defendant. She and defendant had a serious boyfriend-girlfriend relationship at the time. They broke up in June or July 2010.

In January 2009, defendant "wanted to get more money." Emily knew he robbed marijuana dealers for money. She had seen him with a gun a couple of times. He sometimes brought money home after the robberies, and he sometimes texted her while committing robberies. He used the terms "lick" or "wipe" for robbery and "grapes" for marijuana. "Jock" was a nickname for Aaron Marks; "Tay" was a nickname for Tamon Lewis. Defendant used the terms "thang," "pistol," and "cannon" for gun. He sometimes talked about getting a gun when he was planning a robbery.

At some point on January 19, 2009, defendant went out to get marijuana and came home about 5:00 a.m. or 6:00 a.m. on January 20. He acted "weird" and "seemed scared and concerned." Defendant and Emily watched the television news together at 7:00 a.m. or 8:00 a.m. During a broadcast about a shooting in Danville involving marijuana, defendant acted "weirder." Emily asked defendant if he had done anything wrong. "He was hesitant to tell me, and he was scared and told me that things didn't go right. [¶] ... [¶] He said someone had—had got shot. [¶] ... [¶] He said it was an accident and he felt really bad." Later that morning, he changed both of their cell phone numbers. He said, "[h]e didn't want the police to come."

Acting on leads provided by Gene Souza and others, homicide detective Fawell identified the cell phone number ending in 1818 as belonging to Emily Amkhamavong. On January 22, Fawell authored warrants for records for various cell phones, including Emily's, and for Marks's arrest.

On January 23, the Sheriff's Office received an anonymous tip about Marks's location. He was arrested the same day in Oakland and his cell phone was seized. His appearance was similar to the description Koepp gave of the person he saw talking to Fuchs in the driveway.

Also on January 23, police went to the Amkhamavong home in Richmond. Tony Amkhamavong was a person of interest because of Koepp's information about the Asian driver. He was not at home, but Emily and defendant were. Although they were not suspects, Emily and defendant were interviewed separately about their cell phones. Defendant said he left his phone at his friend Devin's house. Emily said hers had fallen out of her pocket while

4

she was running to BART, which she and defendant had agreed beforehand she would say. When the officers asked Emily where defendant was the night of January 20, she said he was out until 5:00 a.m. or 6:00 a.m.; she did not know defendant had told police he was with her all night. When defendant was confronted by police about the discrepancies between his and Emily's statements, he ran away. Two officers chased him but were unable to catch him. After defendant ran away, police re-interviewed Emily. She told them Aaron Marks was the shooter to protect defendant, because she thought defendant was the shooter.

In January 2009, Devin McCalope and defendant were close friends who saw each other daily. McCalope was staying at his grandmother's house in Berkeley, but his "play auntie" lived next door to defendant's family home on Martin Luther King Boulevard in Berkeley, and he saw members of defendant's family all the time. On the day of the shooting, McCalope saw defendant use Kevin Dixon's phone and heard him say something about getting a "thang," meaning a gun. Defendant invited McCalope to go with him to Danville to get some marijuana. When McCalope asked defendant if he was going to buy it, defendant did not answer. McCalope got a bad feeling and decided not to go.

On January 21, 2009, defendant and McCalope watched a newscast about the shooting in Danville. Defendant said he did the shooting and it was "an accident." He said the person was running away, and defendant meant to shoot in the air to scare him, but instead he shot the person in the neck. He said the person was still alive when he left. A few days later, McCalope reported what defendant told him to the Berkeley Police Department. At that point, no one had threatened him. FN4.

> FN4. At trial, McCalope acknowledged he told the prosecutor's investigator he was afraid about testifying. He said he did not want to testify, but he was ready to do so. Defendant had accused him of talking to the police, which McCalope denied. Defendant said if he was convicted, he would know McCalope had been talking to the police.  Also, about a year earlier, after McCalope had testified at another hearing, defendant's sister Danika punched him. She was angry that defendant was in custody, and she blamed McCalope. Finally, the night before his testimony, Danika had called him and said that she needed to talk to him. She came by his house and drove him to meet with the defense investigator. She stayed in the car or nearby while he talked with the investigator on the street, and she eventually left. The investogator told him defendant might go free if McCalope did not testify, and suggested McCalope could refuse to testify by invoking the Fifth Amendment.

On January 27, 2009, Berkeley police contacted police in Danville about McCalope's statement. Detective Fawell interviewed

5

McCalope the next day. Defendant was upset that McCalope had talked to the police and asked him to lie when he talked to the Danville investigators. Defendant told him to say he was playing basketball and ran when he heard the shots. McCalope told the investigators the basketball story, but later told them the truth. FN5.

> FN5. At trial, McCalope admitted convictions for petty theft in 2003; attempted robbery in 2004; and petty thefts in 2007 and 2012.

On May 18, 2009, Detective Fawell interviewed Kevin Dixon, whose cell phone had significant contacts with people important to the investigation. Dixon had heard about what had happened. He told the police, "That they didn't buy it. That they didn't get it. They didn't get the weed. It went bad. Dude was leaving and I guess he died." McCalope told Dixon defendant got the gun from Tamon, and that he fired a warning shot that hit the victim in the neck. After the shooting, defendant and McCalope were not getting along.

At trial, Dixon reluctantly admitted he let defendant use his cell phone on January 20, 2009. Later that day, Dixon received an incoming call from someone he did not know, asking for defendant. He denied he heard about a murder after letting defendant use his phone, denied McCalope told him defendant shot someone, and denied defendant and McCalope were having problems.

In late May 2009, defendant was taken into custody in Alameda County. He called Emily from jail and asked her to make three-way calls. She made one three-way call to "Tay", and defendant told her to delete that telephone number. Between January 2009 and June or July 2010, when they broke up, defendant never once told her Aaron Marks or someone

In June 2009, detectives re-contacted Emily in an attempt to find defendant. Although Emily knew defendant was in jail, she did not tell the police. They also re-interviewed her about the shooting. At first, she again said Marks was the shooter. However, later in the interview, Emily said it was defendant who shot Fuchs. She also said defendant had not given her any specifics about the shooting except that he went to Danville to do a marijuana robbery and "it was just supposed to be a regular lick," but the gun went off once by accident; he only meant to scare the victim. He went to Danville in Tay's black car, and he committed the robbery with four or five people, including Tay, Marks, and others. Emily told the police she would be honest. In a jail phone call, defendant told her to stop talking to the police.

Defendant was scheduled to be released from Alameda County jail on November 18, 2009. He was taken into custody on the Fuchs murder upon his release. Detective Meth *Mirandized* and interviewed defendant at the Martinez Detention Facility. Detective Meth played for defendant part of his interview the previous day

6

with Emily, in which she repeatedly said defendant reported to her that he accidentally shot the gun and only meant to scare Fuchs.

### C. Expert Testimony About Drug Robberies

Sergeant Brian Gardner of the Contra Costa County Sheriff's Office testified as an expert in marijuana sales. The terms "lick" and "wipe" are street terms for a drug robbery. In his experience, it was not common for people from Alameda County to go to Danville to buy marijuana; nor was it common for eight people to travel together to buy four ounces of marijuana; nor would it be normal to bring a gun to buy four ounces of marijuana.

## II. The Defense Case

Approximately two weeks before his testimony, defense investigator Edward Stein spoke with Devin McCalope in a parking lot in Berkeley at defense counsel's request. He arranged the interview through defendant's sister, because she knew him and he did not. McCalope said he wanted to help, and Stein said: "if you want to help Walter, you need to tell the truth." Stein did not say anything about defendant going free if McCalope refused to testify. In the conversation, McCalope asked what would happen if he did not testify, and Stein explained he could be held in contempt and go to jail. McCalope said he guessed he was going to jail. Stein told him he would not do defendant any good in jail.

Defendant testified on his own behalf. FN6. In January 2009, he was going to school at Berkeley City College and living in Berkeley with his mother. He was getting financial aid, and his parents were giving him money, but he was also selling marijuana to support himself. He had started selling marijuana in October 2008. Defendant denied committing any robberies for marijuana. He said Emily's testimony to the contrary was a lie.

> FN6. Defendant acknowledged juvenile adjudications for robbery in 2004, misdemeanor grand theft in 2007, and felony residential burglary in 2009.

Defendant met Aaron Marks in 2007. They were friends who would smoke and buy marijuana and "hang out" in North Oakland together. In 2009, Marks, lived in Oakland and San Ramon, and went to school in San Ramon. On January 20, 2009, Marks said he was planning to buy some weed and invited defendant to go along; defendant agreed.

In January 2009, defendant was close with Devin McCalope, although they occasionally had misunderstandings. Around 12:00 noon on January 20, defendant, McCalope, and Kevin Dixon met near defendant's house on Martin Luther King and smoked marijuana together. Defendant denied telling McCalope he was going to buy marijuana with Marks or inviting him to come along.

7

Defendant admitted using Dixon's cell phone, but denied using it to locate a handgun. Defendant used McCalope's house phone, because he left his phone charging at his house. He denied Tamon Lewis gave him a gun, or that he told McCalope Tamon did so.

Later, he met Marks in North Oakland and went with him to buy marijuana. A Caucasian he did not know was driving. Marks said nothing about a robbery. When they took a different route than usual, defendant asked where they were going. Marks said they were going to Danville to get four "zips," or ounces, of marijuana. He did not think it was going to be a robbery because Marks said "the person he was getting [the marijuana] from was the one he went to school with. So I didn't think he was going to rob someone he went to school with." They parked in Danville at approximately 8:45 p.m. or 9:00 p.m., and defendant got out of the car to smoke a marijuana "blunt" while Marks, who was wearing a backpack, walked away and out of sight to buy the marijuana. Defendant did not see any occupants of the car with a gun and did not have one himself. After he lost sight of Marks, he heard a shot, and turned his head to look in the direction of the shot. At that point, the driver of the car told him to get in, which he did. As they drove off, he saw Marks running down the street toward them with something in his hand that looked like a gun. The driver drove away without picking him up. They drove to a friend's house in Berkeley, where defendant spent the night.

He went to Emily's house about 7:30 a.m. or 8:00 a.m. the next morning. They watched a news program about a shooting in Danville. He denied saying anything to Emily about the incident. Defendant denied ever telling Emily he shot Fuchs, or planned to rob him, or planned to commit a robbery in Danville on January 20, or about trying to scare the person in Danville.

On January 23, detectives came to Emily's house at 6:30 a.m. or 7:00 a.m. and asked him where he was on January 20. He denied discussing with Emily what to say about their cell phones or his alibi. Defendant told the officers he had been in Berkeley on January 20 because he did not want to put himself in Danville. He did not think the police "was gonna believe that I just went there to get marijuana" because "I'm young, and I'm black, African American so I didn't think they was gonna believe that I was there when the shooting occurred and I didn't have anything to do with it." He ran from police because they caught him in a number of lies, and he "just panicked."

He could not remember which lie caused him to run, but it could have been the lie about his losing his phone because he knew it connected him to Marks. There were text messages between him and Marks about "doing a lick," and getting a gun to rob someone in San Ramon on January 16. Defendant and a friend had driven to San Ramon to meet Marks, but they made sure they were "late on purpose because we didn't want to participate in the robbery...." He

did not participate in the robbery that night. Marks was mad at him for not joining in, but he "got over it." No text messages were exchanged between him and Marks on January 20 about a robbery. FN7.

> FN7. Defendant acknowledged he texted Tamon Lewis on January 17 about another robbery with Marks. Before the shooting, Marks told him about another armed robbery he committed in addition to the one in San Ramon on January 16, but defendant denied supplying Marks with a gun, seeing Marks commit a robbery, or participating with Marks in a robbery.

Around 12:00 noon on January 23, defendant spoke to McCalope. He told McCalope that homicide detectives came to Emily's house and questioned him about his whereabouts on January 20. He denied discussing with McCalope anything about going to Danville. He never told McCalope to tell the police he was playing basketball and heard shots fired.

On January 23, he also went back to Emily's house. She gave him a card with a detective's number on it. He later called the detective from his mother's house because he felt he "needed to clear up [his] story." He told the detective the truth at some point during the conversation.

Defendant was cross-examined about his cell phone usage. Cell phone records for defendant's phone showed calls to Fuchs at 5:00 p.m. on January 18; at 1:05 p.m., 1:07 p.m., and 3:02 p.m. on January 19; and at 11:37 a.m. and 1:38 p.m. on January 20. Emily's phone was also used on January 19 to call Fuchs.

While he was in jail, defendant spoke to Tamon Lewis and others on the phone about them talking to the police. It upset him at the time "because the detectives was saying that my friends was talking about me." He told his friends, "How these people gonna say something about me when they wasn't even there [?]" Defendant also spoke with Emily many times and knew she told the detectives that he told her he shot Fuchs. He worried "the detectives was gonna try to use her against me." He urged her to tell the truth in court, because he knew that what Emily told the officers was a lie.

**III. Prosecution Rebuttal**

Captain Chris Simmons of the Contra Costa County Sheriff's Office interviewed defendant on the porch outside Emily's house on January 23. Initially, defendant said he was at Emily's house all night on January 20. Confronted with Emily's statement contradicting him, defendant said he was somewhere else that night. Defendant and Emily also contradicted each other about what happened to defendant's cell phone. Defendant ran off after officers asked him about his ties to North Oakland.

9

Later that day, defendant called Simmons to apologize for running away. The call was recorded. He said Marks told him he needed a ride to Danville for a marijuana deal and wanted defendant to go with him, but he did not want to go, even though Marks said there was a lot of marijuana and it would be worth it. Eventually, defendant admitted he went to Danville and waited with the driver, who was African–American, outside the car. Defendant said he did not see a second car, but he did not deny there was a second car of perpetrators. He heard a gunshot and left with the driver of the car while Marks ran after them. He said Marks had the gun in his hand; he also said Marks had the gun in his pocket. The next morning, he watched the news of the shooting with Emily. He told her he was there, and that Marks was the shooter.

Simmons also testified he was aware of the media coverage of the homicide. Among other things, the media had not published that the victim was still alive when the shooter left, that the victim ran before being shot, that the shooter had tried to fire a warning shot, or that it was an accidental discharge.

People v. Bell, No. A139053, 2014 WL 7463182, at **1-7 (Cal. Ct. App. Dec. 31, 2014) (footnote numbering in original).

## DISCUSSION

### A.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.? 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ

if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

**B.     Claims & Analysis**

Petitioner raises three cognizable claims for habeas relief under § 2254: (1) improper exclusion of a recorded telephone call, (2) improper exclusion of Marks's out-of-court statements, and (3) improper exclusion of petitioner's

family members from the courtroom during McCalope's testimony.

### 1.    Improper Exclusion of Recorded Telephone Call

Petitioner claims that the trial court's exclusion of his November 17, 2009 recorded telephone call to Emily to impeach her testimony and corroborate his own testimony violated his due process right to a fair trial and to present a full defense. ECF No. 1 (Pet.) at 5. The claim is without merit.

### a.    Background

Emily was petitioner's serious girlfriend at the time of Fuchs's murder. In January 2009, Emily knew petitioner "wanted to get more money," and she knew he robbed marijuana dealers for money. Bell, 2014 WL 7463182, at *3. Petitioner sometimes talked about getting a gun when he was planning robberies, and she had seen him with one. He sometimes texted her while committing the robberies, and later brought home money. Petitioner left to get marijuana in the evening on January 20, 2009 and returned to Emily's home early in the morning on January 20. Emily said he acted "weird" and "seemed scared and concerned." Id. That morning, they watched the news together, which covered the murder in Danville. Emily said petitioner acted "weirder" during the broadcast. Id. When she asked if he had done anything wrong, Bell was hesitant but told her "that things didn't go right. [¶] ... [¶] He said someone had—had got shot. [¶] ... [¶] He said it was an accident and he felt really bad." Id. Petitioner changed both of their phone numbers. Id.

On January 23, police came to Emily's house looking for her brother Tony, who was a person of interest at the time. Emily and petitioner were home at the time, and the police asked them about their cell phones. Emily told the police that petitioner had been out until the early morning on January 20, not knowing petitioner had claimed he was with her all night. Petitioner ran away

1   when the officers confronted him with the discrepancy.

2        The police then re-interviewed Emily, who told them Aaron Marks was

3   the shooter "to protect [petitioner], because she thought [petitioner] was the

4   shooter." Id.  In late May 2009, while petitioner was in custody in Alameda

5   County, he called Emily to have her make a three-way call to "Tay." Id. at *4.

6        In June 2009, police re-contacted Emily to find petitioner.  She knew he

7   was in jail, but did not tell the police.  The officers then re-interviewed her about

8   the Fuchs shooting.  In the beginning of the interview, she maintained that Marks

9   was the shooter, but later in the interview said it was petitioner.  She said

10  petitioner did not give her any specifics other than he had gone to Danville to do

11  a marijuana robbery and that the gun went off once by accident—he only meant

12  to scare Fuchs.  She told the officers petitioner went in Tay's black car and

13  committed the robbery with others, including Marks.  Petitioner told Emily to

14  stop talking to the police.  The two broke up in June or July of 2010.

15        At trial, petitioner testified in his own defense.  He denied Emily's

16  testimony that he had ever committed any marijuana robberies.  He admitted to

17  arriving at Emily's home in the morning of January 20 and watching the news

18  about the Danville shooting.  But he denied saying anything about the incident or

19  ever telling her he shot Fuchs.  Petitioner denied any conversation with Emily

20  about his alibi or their cell phones.  He knew Emily told the police he shot Fuchs

21  and claims he urged her to tell the truth in court—because what she told the

22  officers was a lie.

23        The prosecution called a witness who testified that the media did not

24  publish that the shot was either accidental or intended as a warning.

25        At trial, Emily testified that from 2009 through 2010, petitioner never

26  claimed that someone else had shot Fuchs.  She testified that petitioner never told

27

28                                13

her Marks was the shooter or anything to make her think someone else shot the gun.  To impeach her testimony, petitioner attempted to introduce a recorded phone call between Emily and himself from November 17, 2009 where he "repeatedly tells her that, you know, he never did anything, he never did anything, he's not going to confess to something he didn't do."  Id. at *7.  The prosecutor objected on hearsay grounds and the trial court excluded the evidence, finding that it did not actually impeach Emily's testimony.  Petitioner's counsel conceded petitioner never implicated anyone else in the recording.

On appeal, petitioner argued the trial court erred because the "unqualified and unequivocal testimony elicited from Emily by the prosecutor that [he] never said anything that would make her believe he did not shoot Rylan Fuchs" was contradicted by his own "unequivocal and unqualified denials of culpability seven times during the course of the November 17 conversation."  Id.  Petitioner further argued that he indirectly pointed to someone else when he said "[t]ell whoever did it? [inaudible] So they – you think I'm going down for some whoos [sic] person on what somebody else did?"  Id. at *8.

The California Court of Appeal rejected petitioner's claim on the ground that the exclusion of the November 17, 2009 recorded conversation was "proper." Id.  The court found that petitioner did not proffer any exception to the hearsay rule, and that there was no abuse of discretion in excluding the recording even if it was not excludable hearsay because petitioner did not make an adequate showing in support of his theory that "someone other than himself shot Fuchs." Id. at *9 (citation omitted).  The court explained that California law holds that even third-party culpability evidence should be excluded if its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion, and that the probative value of the recording at issue was "slight, whereas its potential

14

for delay and confusion of issues was great." Id. (citing People v. Prince, 40 Cal.4th 1179, 1243 (2007)).

The California Court of Appeal also rejected petitioner's claim that excluding the recording for impeachment purposes implicated his right to confront witnesses under Ortiz v. Yates, 704 F.3d 1026 (9th Cir. 2012), because, unlike in Ortiz, the recording here would not show that Emily's testimony was influenced by intimidation or threats.  See Bell, 2014 WL 7463182, at *10 (discussing Ortiz).

In sum, the California Court of Appeal concluded that petitioner did not "demonstrate[] the court erred in excluding hearsay evidence of exculpatory statements [he] made to Emily in a telephone call to impeach her testimony that [petitioner] never said anything to her that made her believe someone else shot the victim, and corroborate his testimony that he did not shoot Fuchs or admit to her that he did.  No error appears."  Id. at *10.

### b.   *Clearly established federal law*

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (citation and internal quotation marks omitted).  But this latitude has limits because the Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense.  See id. (noting that right to present a complete defense may be rooted in Due Process Clause of 14th Amendment or in Compulsory Process or Confrontation Clauses of 6th Amendment).  This guarantee is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.  Id. at 324-25.

15

1   The Supreme Court also has made clear that a criminal defendant has a

2   right to present evidence in his defense that is "relevant and material, and . . .

3   vital to the defense," Washington v. Texas, 388 U.S. 14, 16, (1967), and that state

4   rules of evidence cannot be applied "mechanistically to defeat the ends of

5   justice," Chambers v. Mississippi, 410 U.S. 284, 302 (1973).  But the Supreme

6   Court "[o]nly rarely" holds that defense evidence excluded under a state

7   evidentiary rule violates the right to present a complete defense.  See Nevada v.

8   Jackson, 133 S. Ct. 1990, 1992 (2013); see also id. at 1994 (noting that Supreme

9   Court's precedents could not be framed so generally as to recognize a broad right

10  to present evidence bearing on a witness's credibility).  While the Constitution

11  prohibits exclusion of defense evidence under rules that serve no legitimate

12  purpose or that are disproportionate to the ends that they are asserted to promote,

13  "well-established rules of evidence permit trial judges to exclude evidence if its

14  probative value is outweighed by certain other factors such as unfair prejudice,

15  confusion of the issues, or potential to mislead the jury."  Holmes, 547 U.S. at

16  326 (citations omitted).

17  The Ninth Circuit considers five factors to determine whether the

18  exclusion of evidence violates a criminal defendant's due process right to a fair

19  trial or to present a defense: (1) the probative value of the excluded evidence on a

20  central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier

21  of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and

22  (5) whether it constitutes a major part of the attempted defense.  Chia v. Cambra,

23  360 F.3d 997, 1004 (9th Cir. 2014).[1]  A court also must give due weight to the

24  _____

25  [1]These factors are circuit-made and not "clearly established" Supreme Court
26  precedent.  See Moses v. Payne. 555 F.3d 742, 760 (9th Cir. 2009).  Thus, it is not an
    "unreasonable application" of "clearly established" Supreme Court precedent if a state
27  court does not apply these factors.  See id. at 758-59.

28                                                    16

state interests underlying the evidentiary rules on which the exclusion was based. Id. at 1006.

In order to obtain federal habeas relief, a petitioner also must demonstrate that the constitutional violation "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (citation and internal quotation marks omitted).

### c. Analysis

The California Court of Appeal's rejection of petitioner's claim that the trial court's exclusion of the November 17, 2009 recorded telephone conversation between him and Emily violated his due process right to a fair trial and to present a full defense was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor did it involve an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The court of appeal reasonably determined that the trial court did not violate petitioner's constitutional rights by excluding the recording to impeach Emily's testimony that petitioner never claimed that someone else had shot Fuchs, or to corroborate petitioner's testimony that Marks shot Fuchs.

Although there is no clearly established Supreme Court precedent holding that there is a broad constitutional right to present evidence bearing on a witness's credibility, see Jackson, 133 S. Ct. at 1994, this appears to be exactly what petitioner sought to do with the recording, i.e., to impeach Emily's credibility. And unlike in Ortiz, where the proffered evidence was sought to show that the witnesses's testimony was influenced by intimidation or threats, petitioner here did not reveal a substantial motive for Emily to lie that he could persuasively challenge with the recording. See Bell, 2014 WL 7463182, at *10 (citing Ortiz, 704 F.3d at 1036). In fact, the recording does not even truly

17

impeach Emily's testimony. Accord id. at *9 ("Furthermore, Emily's testimony, that [petitioner] 'never said anything that would make her believe he did not shoot Rylan Fuchs' was not contradicted by [petitioner]'s statements that he did not do it and was not 'going down for some whoos [sic] person on what somebody else did.' She evidently did not believe what [petitioner] said on November 17, 2009, because she testified at trial to all the things he told her the morning of January 21, 2009 that made her believe he shot Fuchs, even though he did not say the words, 'I shot the gun.'") (emphasis in original). The court of appeal reasonably rejected petitioner's claim that the trial court's exclusion of the recording to impeach Emily amounted to constitutional error.

The court of appeal also reasonably rejected petitioner's claim that the trial court's exclusion of the recording to corroborate petitioner's trial testimony that Marks or someone other than petitioner shot Fuchs amounted to constitutional error because the recording was not "relevant and material, and . . . vital to the defense." Washington, 388 U.S. at 16 (emphasis added). Application of the five factors from Chia to the exclusion of the recording confirm this conclusion. See 360 F.3d at 1004. The first Chia factor – the probative value of the excluded evidence on a central issue – weighs against petitioner because the probative value of the recording to petitioner's claim of third-party culpability was slight in that petitioner does not even point to a culpable third party in the recording. Accord Bell, 2014 WL 7463182, at *9 ("probative value of the evidence was slight, whereas its potential for delay and confusion of issues was great"). So do the second and third Chia factors – reliability and whether it is capable of evaluation by the trier of fact – because petitioner's proclamations of innocence in the recording are self-serving and confusing. The fourth Chia factor – whether it is the sole evidence on the issue or merely cumulative – also weighs

against petitioner because petitioner's proclamations of innocence on the recording was not the only evidence of his claim of innocence.  Petitioner testified in his own defense and denied ever committing any marijuana robberies or shooting Fuchs.  Finally, the fifth <u>Chia</u> factor – whether it constitutes a major part of the attempted defense – weighs against petitioner because petitioner "did not identify any basis for admitting his claims of innocence as circumstantial evidence <u>relevant to some disputed fact</u>, regardless of their truth." <u>Id.</u> at *9 (emphasis added).  After all, the  excluded recording did not even point to a culpable third party.

Petitioner is also precluded from federal habeas relief on his claim of improper exclusion of the recording because he has not shown prejudice.  He has not shown that the exclusion of the recording had a substantial and injurious effect or influence in determining the jury's verdict.  <u>See</u> <u>Brecht</u>, 507 U.S. at 623.  As noted earlier, the probative value of the excluded evidence was slight; petitioner's claim of innocence was otherwise available; and the recording was not a major part of the attempted defense.  Furthermore, Emily was not the only witness to whom petitioner admitted shooting Fuchs.  Petitioner also told McCalope that he shot Fuchs and that it was an accident.

Petitioner is not entitled to federal habeas relief on his claim that the trial court's exclusion of the November 17, 2009 recorded telephone conversation between him and Emily violated his federal constitutional rights.

### 2.      Improper Exclusion of Marks's Out-of-Court Statements

Petitioner claims that the trial court's exclusion of Aaron Marks's out-of-court inculpatory statements violated his due process right to a fair trial and to present a full defense.  ECF No. 1 (Pet.) at 5.  He also claims that he should have been permitted to cross-examine Koepp about Marks's reputation for

committing violent drug robberies.  Id. at 8.  The claim is without merit.

### a.    Background

Defense counsel made an in limine motion to introduce statements Marks made to his former group home counselor, James Mitchell, and to police after his arrest. FN12. Marks made two phone calls to Mitchell after Fuchs's murder, one on January 21, 2009 at 11:15 p.m., and one on January 22, 2009 at 12:15 a.m. At first, Marks said he was in Hawaii but, faced with Mitchell's skepticism, admitted he was lying, although he refused to disclose his location. Mitchell advised Marks the police were looking for him and urged him to turn himself in. Marks acknowledged he had watched the news and knew the homicide victim. He admitted he had done drug deals with the victim in the past and had planned to buy drugs from him the night he was killed. Marks said he did not kill the victim and was not at the scene, but the police would never believe he was not involved because of the text messages on his cell phone. Mitchell opined Marks was intoxicated; Marks said he was drinking cough syrup and wanted to die. He agreed to turn himself in the next day.

> FN12. Marks was shot to death in Oakland on November 24, 2012, according to a death certificate[] submitted to the court in connection with the motion.

While Marks was sitting in the back of a patrol car after his arrest, Marks asked Detective Meth, "Do you think I'm a bad person for what I've done?" However, when interviewed at 2:30 a.m., Marks denied knowing Fuchs. He then admitted he had heard something about Fuchs being killed. Finally, he admitted meeting Fuchs while living at a group home in Danville and talking with him about drugs. Marks claimed he was at his aunt's apartment the entire night of January 20, 2009, into the next day. He admitted texting Fuchs about drugs that day. He said he and Fuchs were friends who enjoyed a good relationship. He stood Fuchs up at the time of the purchase because he did not have any money and he does not rob people. He would not say how much marijuana he was supposed to buy because he did not want to be a snitch. He claimed other people used his cell phone. Asked about his statement to Mitchell that he wanted to die, Marks stated he had been misunderstood and was talking about life in general.

Marks was interviewed again the next day. He asked: What if he was at the scene to get weed, left, and did not know what happened after that? Eventually, he admitted he met Fuchs the night of the shooting and purchased marijuana from him. However, he adamantly denied being the shooter or going to Danville to rob him. He felt accused because he was "young and black."

The court ruled Marks's statements did not qualify for admission under Evidence Code section 1230, stating: "[T]he issues really fall

1

2

3

4

5

6

7

8

9

10

11

12

     on whether or not the statements are clearly statements that show that they are against his penal interest when made. And the Court has had an opportunity to look at the statements that he made, the entire context in which they were made, and although they indisputably contain some admission that appear on their face to be contrary to Mr. Marks' interest, in avoiding criminal liability and punishment.... [¶] However, the statements [are] viewed in the context to determine whether they are self inculpatory.... [¶] ... He also tried to paint himself in a different light, his relationship with the victim, saying they were friends, that they had a good relationship. With the cell phone messages, that someone else was using his phone. He says that he did not shoot him, he denied being the shooter and denied being there for the robbery, and said he was being accused because he was young and black. [¶] So I think that the statements, when taken as a whole, show that Mr. Marks is trying to put himself in a positive light. They were friends, to show they had a good relationship. And although there are some that are disserving, that when you take it all in whole, it should not be admitted because it lacks the trustworthiness. [¶] The Court considered the possibility of the redaction. However, in light of the circumstances, the Court finds that the statement lacks sufficient indicia of trustworthiness to qualify for admission."

Bell, 2014 WL 7463182, at **10-11 (footnote numbering in original).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

     On appeal, petitioner argued that the trial court improperly excluded Marks's out-of-court, partially inculpatory statements and thereby denied him his right to present a defense of third-party culpability.  The California Court of Appeal evaluated the claim under the state law standard that for third-party culpability evidence to be admitted, the evidence must "'be capable of raising a reasonable doubt of defendant's guilt,'" and rejected it.  Bell, 2014 WL 7463182, at *11 (quoting People v. Hall, 41 Cal.3d 826, 833).  The court explained that Hall could not be read to let rules of evidence "'impermissibly infringe on the accused's right to present a defense.'"  Id. (quoting Hall, 41 Cal.3d at 834).  But because Marks's statements were partially inculpatory and partially exculpatory "(e.g., one which admits some complicity but places the major responsibility on others)" they were inadmissible because the partially self-serving nature of the statements means that they "'do[] not meet the test of trustworthiness.'"  Id. at *11 (quoting In re Larry C., 134 Cal. App. 3d 62, 69 (1982)).  The court went further,

28

1   and cited Supreme Court precedent noting that for a statement to be admissible as

2   against penal interest, it must be "truly self-inculpatory, rather than merely [an]

3   attempt[] to shift blame or curry favor." Id. at *11 (quoting Williamson v. United

4   States, 512 U.S. 594, 603 (1994)).

5          The California Court of Appeal specifically found that in the proffered

6   statements "Marks incriminated himself about relatively minor matters (buying

7   marijuana from Fuchs the night he was shot), exculpated himself from major ones

8   (shooting Fuchs, or even being on the scene when Fuchs was shot), prevaricated,

9   changed narratives, minimized his involvement, and even tried to engender

10  sympathy for himself." Id. at *12. The court concluded that the trial court did

11  not err in excluding Marks's statements because the statements were "profoundly

12  lacking in basic trustworthiness and factual truthfulness." Id.

13         The California Court of Appeal also rejected petitioner's claim that he was

14  wrongfully prevented from fully cross-examining Koepp about Marks's

15  reputation for committing violent drug robberies. Id. The court noted that the

16  prosecutor objected to the questioning on foundation grounds and, after an

17  unrecorded sidebar, the trial court sustained the objection. Id. The court

18  affirmed the trial court's ruling because petitioner did not demonstrate error and

19  its independent review of the record of Koepp's testimony showed "no

20  foundation for anything he may have known about Marks, other than his name

21  and appearance." Id.

### b.    Clearly established federal law

23                 It is well established that the exclusion of evidence that

24  another person may have committed the crime violates due process. See

25  Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973). In Chambers, the

26  Supreme Court found constitutional violation in mechanistically applying state

27

28                                         22

hearsay rules to exclude inculpatory statements by a third party with persuasive assurances of trustworthiness—as they were within the basic rationale for a statement against interest exception to the rule against hearsay.  See id. at 302. Such statements against interest are based on the "commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson, 512 U.S. at 599.  In this respect, the statements of "arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor."  Id. at 603.  Accord Phillips v. Herndon, 730 F.3d 773, 778 (9th Cir. 2013) (not unreasonable application of clearly established Supreme court precedent for state court to conclude that accomplice's inculpatory statement was properly excluded as unreliable/untrustworthy because accomplice gave three conflicting and contradictory versions of the murder).

In order to obtain federal habeas relief, a petitioner also must demonstrate that the constitutional violation "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (citation and internal quotation marks omitted).

### c.    Analysis

The California Court of Appeal's determination that Marks's statements were untrustworthy and therefore inadmissible was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor did it involve an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Rather, the court reasonably concluded that due to the partially inculpatory (as to minor offenses) and partially exculpatory (as to the major offenses) nature of Marks's statements to Mitchell and Detective Meth, the

statements were not sufficiently trustworthy to be admitted as evidence that
tended to show Marks's culpability.

Unlike in Chambers, where the Court found that the excluded statements
had persuasive assurances of trustworthiness (as they fit well within a statement
against interest exception to the hearsay rule), see 410 U.S. at 302, the California
Court of Appeal found that Marks's statements did not have such assurances, see
Bell, 2014 WL 7463182, at *12. As a whole, the court found that Marks's
statements instead were "profoundly lacking in basic trustworthiness and factual
truthfulness." Id. This factual determination is entitled to a presumption of
correctness petitioner does not rebut. See 28 U.S.C. § 2254(e)(1). After all,
Marks' differing accounts of the night of Fuchs's murder, even if truly
inculpatory, were unreliable/untrustworthy because of their conflicting nature.
And on that basis alone, the California Court of Appeal's rejection of petitioner's
claim that the exclusion of Marks's statements violated his federal constitutional
rights cannot be said to be contrary to, or an unreasonable application of, clearly
established Supreme Court precedent. See Phillips, 730 F.3d at 778 (not
unreasonable application for clearly established Supreme court precedent for
state court to conclude that accomplice's inculpatory statement was properly
excluded as unreliable/untrustworthy because accomplice gave three conflicting
and contradictory versions of the murder).

The California Court of Appeal did not unreasonably reject petitioner's
claim that the trial court improperly denied him an opportunity to cross-examine
Koepp about Marks's reputation for violence. The court correctly noted that the
prosecution objected to petitioner's questioning of Koepp for lack of foundation
and that there was no basis on the record to find that Koepp would have testified
in such a manner that would have tended to point to Marks as the culpable party.

The only foundation on the record was that Koepp knew what Marks looked like. See Bell, 2014 WL 7463182, at *12.

Petitioner is also precluded from federal habeas relief on his claims of improper exclusion of Marks's out-of-court statements, and improper denial of an opportunity to cross-examine Koep about Marks's reputation for violence, because he has not shown prejudice. He has not shown that these alleged errors had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 623.

The exclusion of Marks's out-of-court statements cannot be said to have "resulted in 'actual prejudice.'" Id. at 637 (citation omitted). First, none of Marks's statements tended to exculpate petitioner. Marks said he did not kill Fuchs and was not at the scene, although the police would not believe him because of various text messages on his phone. See Bell, 2014 WL 7463182, at *10. Marks asked Detective Meth if Meth thought he was a bad person for what he had done, but Marks did not explain precisely what he did. Marks then said he never met up with Fuchs because he did not have the money and he does not rob people. Id. Marks finally admitted to being present the night of the shooting and buying marijuana from Fuchs, but adamantly denied being the shooter. Id. at *11. Not one of these statements indicate that petitioner was not actively involved in the robbery or was not an accomplice to it. Second, the exclusion of of Marks's statements cannot be said to have had a substantial and injurious effect on a jury's finding that petitioner shot the gun because Marks adamantly denied being the shooter.

In regards to petitioner's claim that the trial court improperly denied him an opportunity to cross-examine Koep about Marks's reputation for violence, petitioner testified as to Marks's involvement in a January 16, 2009 armed

robbery.  See Bell, 2014 WL 7463182, at *12.  Thus any potential testimony from Koepp as to Marks's reputation for violence would have been cumulative of other testimony and its exclusion therefore cannot be said to have resulted in actual prejudice.  See Brecht, 507 U.S. at 637.

Petitioner is not entitled to federal habeas relief on his claims that the trial court's exclusion of Marks's out-of-court statements, and denial of an opportunity to cross-examine Koepp about Marks's reputation for violence, violated his federal constitutional rights.

### 3.   Improper Exclusion of Family Members from the Courtroom

Petitioner claims that the trial court's exclusion of his mother and two sisters from the courtroom during McCalope's testimony violated his right to a public trial.  ECF No. 1 (Pet.) at 5.  The claim is without merit.

#### a.   Background

Before Devin McCalope testified, the prosecutor made a request in chambers to exclude defendant's sister, Danika, from the courtroom during his testimony. FN13. The prosecutor represented to the court that, just before he testified, McCalope told the prosecutor that he would feel safer if Danika was not present while he testified. McCalope reported that after he testified at the preliminary hearing, Danika approached him and physically hit him. Then, the day before his trial testimony, Danika was present at McCalope's meeting with the defense investigator, which made him feel uncomfortable, intimidated, and scared. Based on the prosecutor's representations, the court asked Danika to "step outside of the courtroom during his testimony" over a defense objection.

> FN13. The prosecutor also requested leeway "to treat [McCalope] as a hostile witness, to ask leading questions of him." The request was granted because it was apparent to the court that McCalope was mentally slow and had "some sort of a disability."

On direct examination, McCalope testified he had not wanted to testify a year earlier in this matter, and preferred not to testify at trial. Asked whether anything bad had happened after his preliminary hearing testimony, McCalope testified that defendant's sister, Danika, was angry because defendant was in custody, and she blamed McCalope for talking to the police. She had come up to him in a store and punched him. He acknowledged telling the

1   district attorney's investigator Dominic Medina that he was afraid
to testify. The prosecutor had to repeatedly ask him to remove his
2   hands from his face.

3   The next morning, before McCalope resumed his testimony, the
court cleared the courtroom of jurors and audience for an in-camera
4   hearing at the prosecution's request. The prosecutor made the
following offer of proof: "This morning Inspector Medina brought
5   Devin McCalope back to court to finish his testimony; and at some
point this morning, Mr. McCalope saw the defendant's mother and
6   the defendant's other sister, a sister other than Danika, whom we
discussed yesterday. And Mr. McCalope reported to the inspector
7   that he would not be comfortable testifying in front of the
defendant's family. He alleges that the mother has called him a
8   snitch before or told him not to snitch, something along those lines;
and that this sister, the sister of the subject today, has not physically
9   assaulted him but has, I think, the word used was haggled [sic ]. I
don't know if that's Inspector Medina's word or Mr. McCalope's
10   word, him over snitching. [¶] And I'm not sure how well the
testimony came out yesterday, but I know from my review of the
11   police reports that Mr. McCalope spends a large portion of his time
at his play auntie's house. Her name is Star Mills, and she lives
12   right next door to the defendant's family's house. Now, I recall that
did come in. They see each other all the time. The families are
13   intertwined. They've known each other for at least a decade. And
he is not comfortable at all, as demonstrated yesterday, in testifying
14   against this defendant publicly. He has serious concerns. So he has
asked that he not have to testify in front of the mom or any family
15   members."

16   McCalope testified at the ensuing hearing he had seen defendant's
mother and his sister Luanda in court earlier. It made him feel
17   "[n]ot good" to see them because "she out there crying." Asked
how he would "feel about testifying with them in the courtroom,"
18   McCalope moved his head from side to side and then said, "No."
He explained defendant's mother told him that she was not happy
19   about him telling on her son, and Luanda had said the same thing to
him. He acknowledged defendant's mother and sister Luanda had
20   confronted him about "telling on" defendant in 2009 or 2010 when
he first got out of jail, and not since. Luanda was with Danika when
21   Danika hit him; "Like, they came outside. They seen me. They was,
like, Tell on my brother. That's all Luanda had said. And then
22   that's when his other sister came, and she was like ... Why you
tellin' on my brother, your partner, whoop, whoop, whoop, and
23   that's when she had hit me." Luanda had not said anything to him
since. However, McCalope saw defendant's mother and sister every
24   day. He knew they did not want him to testify. He feared for his
grandmother's safety. McCalope acknowledged telling Inspector
25   Medina he would be too afraid to testify with them listening. He
wanted them outside the courtroom and thought he could testify
26   more freely with them outside.

27

28                                          27

1
2
3

> Asked by the court whether it would interfere with his "ability to freely testify in this courtroom" if defendant's family was present, McCalope answered, "Yes." The court excluded appellant's mother and both sisters from the courtroom for the remainder of McCalope's testimony.

4
5

> After the hearing, on redirect examination, McCalope testified defendant's family "was making threats," and because of that he wanted them removed from the courtroom.

6   Bell, 2014 WL 7463182, at **12-13 (footnote numbering in original).

7          The California Court of Appeal rejected petitioner's claim that the

8   exclusion of his mother and two sisters from the courtroom during McCalope's

9   testimony violated his right to a public trial.  The court noted that although a

10  violation of the right to a public trial requires automatic reversal, the right to a

11  public trial is not absolute.  Id. at *13.  The "'presumption of openness may be

12  overcome only by an overriding interest based on findings that a closure is

13  essential to preserve higher values and is narrowly tailored to serve that interest.

14  The interest is to be articulated along with findings specific enough that a

15  reviewing court can determine whether the closure order was properly entered.'"

16  Id. (quoting Waller v. Georgia, 467 U.S. 39, 45 (2010)).  The court also noted

17  that temporary exclusion of select supporters of a defendant is not an automatic

18  violation of the right to a public trial.  See id. at *14 (citing People v. Esquibel,

19  16 Cal. App. 4th 539, 554 (2008)).  But it requires a full evaluation for the

20  necessity of the exclusion and the potential alternatives to satisfy both California

21  statutory requirements as well as constitutional requirements.  See id. (citing

22  Esquibel, 16 Cal. App. 4th at 556).

23          The California Court of Appeal then found that

24
25
26

> [t]he trial court undertook such an evaluation here and, in light of the prosecution's offers of proof and McCalope's testimony in open court and at the in-camera hearing, correctly concluded that a temporary exclusion of [petitioner]'s mother and sisters from the courtroom during McCalope's testimony only, was essential to ensuring a fair trial free from witness intimidation.

27

28                                             28

<u>Id.</u> at *14 (citation omitted).  The court specifically found that the record supported the trial court's implied findings that McCalope was a vulnerable witness due to mental disability and that petitioner's mother and sisters made him too fearful to testify freely in their presence, that there were concrete examples of their intimidating behavior, and that McCalope's fear was credible and genuine. <u>Id.</u>  The court concluded:

> In the present case, the trial court did hold a hearing and, in our view, reasonably concluded that the public interest in maintaining an atmosphere free of witness intimidation justified the exclusion of family members during a limited portion of the examination of a single witness.  In our view, this was a de minimis infringement upon [respondent]'s right to a public trial that does not require reversal.

<u>Id.</u> at *15 (citation omitted).

### b.  *Clearly established federal law*

The Sixth Amendment directs, in relevant part, that "'[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and <u>public</u> trial. . . .'" <u>Presley v. Georgia</u>, 558 U.S. 209, 212 (2010) (emphasis added).  The right to a public trial is for the benefit of criminal defendants because it discourages perjury and ensures that lawyers, judges and witnesses carry out their functions responsibly.  <u>See</u> <u>Waller</u>, 467 U.S. at 46.  But the right is not absolute, and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." <u>Id.</u> at 45.  In determining if the public can be excluded at any stage of a criminal trial, courts must apply the following standards:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

29

Id. at 48.  See also United States v. Sherlock, 962 F.2d 1349, 1356 (9th Cir.

1989) (Waller requires that, before a court excludes the public from any stage of

a criminal proceeding, the court must (1) provide the defendant with opportunity

to be heard, (2) make factual findings to support closure and (3) consider

reasonable alternatives to closing courtroom).  When a court closes a trial to the

public, it also must articulate the particular interest that would be prejudiced if

the court were not closed along with findings such that a reviewing court can

evaluate the propriety of the closure.  See Presley, 558 U.S. at 215.

In Waller, the Supreme Court addressed a total closure of a portion of a

criminal trial.  See 467 U.S. 39.  Because it did not address the partial closure of

a portion of a criminal trial, the Ninth Circuit concluded that the standards

adopted by the Waller Court do not necessarily govern partial closures.  See

Sherlock. 962 F.2d at 1356-57.  For partial closures, the Ninth Circuit holds that

only a "substantial," rather than a "compelling," reason for the closure is

necessary.  Id at 1357.  But the trial court still must (1) provided a defendant with

the opportunity to be heard, (2) make factual findings to support the partial

closure and (3) consider reasonable alternatives to the partial closure.  Id. at

1357-59.  Protecting a witness from harassment and physical harm is a

"substantial" reason for a partial closure of a criminal trial.  See United States v.

Hernandez, 608 F.2d 741, 747-48 (9th Cir. 1979).

### c.    *Analysis*

The California Court of Appeal's rejection of petitioner's

claim that the exclusion of his mother and sisters from the courtroom during

McCalope's testimony violated his right to a public trial was not contrary to, or

an unreasonable application of, clearly established Supreme Court precedent, nor

did it involve an unreasonable determination of the facts.  See 28 U.S.C. §

30

1     2254(d).

2          As noted in <u>Sherlock</u>, the Supreme Court's decision in <u>Waller</u> addressed a

3     total closure to the public of a portion of a criminal trial and not a partial closure

4     to select supporters of the defendant of a portion of a criminal trial.  <u>See</u> 962 F.2d

5     1356-57.  <u>Presley</u> did not address a partial closure to select supporters of the

6     defendant either.  Nor have any other Supreme Court cases.  It therefore cannot

7     be said that there is "clearly established federal law, as determined by the

8     Supreme Court," that the California Court of Appeal ruled contrary to, or

9     unreasonably applied, in rejecting petitioner's claim.  28 U.S.C. § 2254(d)(1).

10          Nor can it be said that the California Court of Appeal's rejection of

11    petitioner's claim amounted to an objectively unreasonable application of <u>Waller</u>.

12    <u>See</u> <u>id.</u> § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 409 (2000).  The court of

13    appeal reasonably determinated that protecting McCalope from fear of

14    harassment and physical harm constituted a substantial reason for the partial

15    closure.  <u>See</u> <u>Sherlock</u> 962 F.2d 1357 (partial closure must be supported by

16    substantial reason); <u>Hernandez</u>, 608 F.2d at 747-48 (protecting witness from

17    harassment and physical harm constitutes substantial reason).  The record also

18    shows that the court of appeal reasonably determined that, in accordance with

19    <u>Waller</u>, the trial court held a hearing and implicitly found that McCalope was a

20    vulnerable witness and genuinely fearful of petitioner's mother and sisters.  And

21    while the trial court did not explicitly consider on the record reasonable

22    alternatives to the partial exclusion, petitioner does not offer any and none are

23    apparent.  Not surprisingly, the court of appeal reasonably determined that the

24    trial court's partial closure was narrowly tailored to the interest at hand.  <u>See</u> <u>Bell</u>,

25    2014 WL 7463182, at *14.  After all, the closure applied only to the offending

26    supporters of the accused – petitioner's mother and two sisters – and only during

27

28                                              31

1  McCalope's testimony.  Under the circumstances, petitioner is not entitled to

2  federal habeas relief on his claim that the trial court's exclusion of his mother and

3  two sisters from the courtroom during McCalope's testimony violated his right to

4  a public trial.  <u>See</u> 28 U.S.C. § 2254(d).

5  **CONCLUSION**

6  After careful review of the record and pertinent law, the court is satisfied

7  that the petition for a writ of habeas corpus must be DENIED.[2]

8  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a

9  certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because

10  petitioner has not demonstrated that "reasonable jurists would find the district

11  court's assessment of the constitutional claims debatable or wrong."  <u>Slack v.</u>

12  <u>McDaniel</u>, 529 U.S. 473, 484 (2000).

13  The clerk shall enter judgment in favor of respondent and close the file.

14  SO ORDERED.

15  DATED:  <u>August 5, 2016</u>

16  CHARLES R. BREYER
   United States District Judge

17

18

19

20

21

22

23

24

25  [2]The court will not address petitioner's conclusory claim of actual innocence
   because he did not raise before he filed his traverse and it is well established that the

26  traverse "is not the proper pleading to raise additional grounds for relief." <u>Cacoperdo v.</u>

27  <u>Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994).

28

G:\PRO-SE\CRB\HC.15\Bell, W.15-4970.denial.final.wpd